FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**Feb 28, 2019**

SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

EVAN AULD-SUSOTT, as Trustee )      CIVIL 16-00450 LEK-RLP
for (1) IRREVOCABLE LIFE )
INSURANCE TRUST OF JOHN L. )
SUSOTT AND KATHRYN C. SUSOTT )
UAD 8/17/1988 AS RESTATED, )
EXEMPT TRUST FBO DANIEL C. )
SUSOTT, and (2) IRREVOCABLE )
LIFE INSURANCE TRUST OF JOHN )
L. SUSOTT AND KATHRYN C. )
SUSOTT UAD 8/17/1988 AS )
RESTATED, NON-EXEMPT TRUST )
FBO DANIEL C. SUSOTT; and )
JOHN L. SUSOTT, )
                      )
       Plaintiffs, )
                      )
    vs. )
                      )
LAURYN GALINDO, )
                      )
       Defendant. )
_____ )

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

This matter came on for a bench trial on on July 10 and
11, 2018. Plaintiffs Evan Auld-Susott ("E. Auld-Susott"), as
Trustee for (1) Irrevocable Life Insurance Trust of John L.
Susott and Kathryn C. Susott UAD 8/17/1988 as Restated, Exempt
Trust FBO Daniel C. Susott, and (2) Irrevocable Life Insurance
Trust of John L. Susott and Kathryn C. Susott UAD 8/17/1988 as
Restated, Non-Exempt Trust FBO Daniel C. Susott ("Trusts"); and
John L. Susott ("J. Susott" and collectively "Plaintiffs") were
represented by Peter Knapman, Esq. Defendant Lauryn Galindo
("Defendant") was represented by Wayson W.S. Wong, Esq.

The Court hereby finds in favor of Plaintiffs and against Defendant. Specifically, that Plaintiffs are entitled to judgment on their fraudulent transfer claim, and their claims for unjust enrichment and constructive trust are hereby dismissed. Defendant's Motion for Judgment Under FRCP Rule 52(c) ("Rule 52(c) Motion"), [filed 7/13/18 (dkt. no. 143),] is hereby denied.

The Court, having considered the declarations and evidence admitted into evidence, the testimony at trial, and the arguments of counsel, makes the following Findings of Fact and Conclusions of Law and Decision pursuant to Fed. R. Civ. P. 52. Any finding of fact that should more properly be deemed a conclusion of law and any conclusion of law that should more properly be deemed a finding of fact shall be so construed.

**BACKGROUND**

On April 8, 2010, Daniel C. Susott ("D. Susott") transferred certain real property located at 3880 Wyllie Road, Apartment 6A, Princeville, Hawai`i 96722 ("Property") by quit claim deed to Defendant. [Complaint, filed 8/10/16 (dkt. no. 1), at ¶¶ 7, 14.] As a result, Plaintiffs filed the instant legal action against Defendant. On May 31, 2016, Defendant filed her First Amended Answer to Complaint Filed August 10, 2016. [Dkt. no. 26.]

In the lawsuit, Plaintiffs assert three claims: fraudulent conveyance pursuant to the Hawai`i Uniform Fraudulent Transfer Act ("HUFTA"), Haw. Rev. Stat. § 651C-4(a)(1) ("Count I"); unjust enrichment ("Count II"); and constructive trust ("Count III").

Prior to trial, two substantive rulings regarding Plaintiffs' claims were made in this action. First, on April 9, 2018, this Court issued the Order Denying Defendant's Motion for Summary Judgment ("4/19/18 Order") and ruled that Plaintiffs' release of claims against D. Susott did not also release their claims against Defendant. [Dkt. no. 91 at 7 (citing Haw. Rev. Stat. § 663-15.5(a)).[1]]

Second, on June 27, 2018, this Court issued its Order Granting Plaintiffs' Motion for Partial Summary Judgment and Denying Defendant's Motion for Summary Judgment ("6/27/18 Order") and ruled that both E. Auld-Susott and J. Susott are creditors of D. Susott under Haw. Rev. Stat. § 651C-1, and therefore Plaintiffs both "have standing to pursue their Count I claim against Defendant." [Dkt. no. 122 at 17.[2]]

At trial, the following claims were litigated:

Count I – On April 8, 2010, D. Susott transferred the Property to Defendant "'with actual intent to hinder, delay, or defraud [them in their capacity as] creditor[s] of [D. Susott].'"

_____

[1] The 4/9/18 Order is also available at 2018 WL 1719702.

[2] The 6/27/18 Order is also available at 2018 WL 3148095.

[Complaint at ¶ 19 (quoting § 651C-4(a)(1)).] Further, Plaintiffs allege the Complaint is timely because they "first learned of the fraudulent transfer on March 1, 2016." [Id. at ¶ 21 (citing Haw. Rev. Stat. § 651C-9).]

Count II – "Defendant knowingly received and accepted the Property from D. Susott without consideration." [Id. at ¶ 24.] Plaintiffs therefore allege Defendant would be unjustly enriched if she were to retain the Property.

Count III – Plaintiffs allege "the circumstances under which Defendant acquired the Property" require imposing a constructive trust to "convert[] Defendant into a trustee holder of the Property for the benefit of Plaintiffs." [Id. at ¶ 27.]

At the non-jury trial, in lieu of live direct testimony, Plaintiffs presented the declarations of E. Auld-Susott and J. Susott. [Dkt. nos. 120, 121.] Defendant likewise presented the declarations of Defendant, Emerald Starr, and Harvey Cohen. [Dkt. nos. 123, 124, 126.] However, because Defendant filed all of her declarations after the court-ordered deadline for filing these declarations, this Court ruled it would consider none of them at trial. [Minutes, filed 7/2/18 (dkt. no. 125).] On July 9, 2018, this Court issued its Order Granting in Part and Denying in Part Defendant's Motion for Reconsideration of this Court's Ruling that She May Not Call Any Witnesses at Trial ("7/9/18 Order"). [Dkt. no. 136.[3]] The 7/9/18 Order permits only Defendant's declaration ("Galindo Declaration") to be considered as direct examination testimony presented by Defendant at the trial. 2018 WL 3350363, at *3.

_____

[3] The 7/9/18 Order is also available at 2018 WL 3350363.

4

The non-jury trial commenced on July 10, 2018 with E. Auld-Susott, J. Susott and Defendant all testifying live on cross-examination. Plaintiffs' Exhibits 2, 7-8, 10-16, 18-19, 21, 26-29, 31, 34, 38-40, and 42-43 were received into evidence, and Defendant's Exhibits E, AA, BB, CC, EE, FF, GG, SS, RR, TT, and YY Exhibits RR and TT were admitted.

On July 26, 2018, Plaintiffs and Defendant both filed written closing arguments. [Dkt. nos. 147, 148.] On August 13, 2018, Defendant filed her Rebuttal to Plaintiffs' Closing Argument, and on August 17, 2018, Plaintiffs filed their Rebuttal to Defendant Lauryn Galindo's Closing Argument. [Dkt. nos. 162, 163.]

At the parties' request, on August 10, 2018, leave was granted to file post-trial proposed findings of fact and conclusions of law. [Dkt. no. 160.] On August 17, 2018 and August 24, 2018, respectively, Defendant filed her Posttrial Proposed Findings of Fact and Conclusions of Law, and Plaintiffs filed their Post-Trial Submission of Proposed Findings of Fact and Conclusions of Law. [Dkt. nos. 164, 165.] On August 27, 2018, Defendant filed her Objections to Plaintiffs' Post-Trial Submission of Findings of Fact and Conclusions of Law. [Dkt. no. 166.]

# FINDINGS OF FACT

The Court makes the following findings of fact based on the declarations, trial testimony, and exhibits submitted by the parties.

## I. Jurisdiction

1. E. Auld-Susott is a citizen of the State of California.

2. J. Susott is a citizen of the State of California.

3. Defendant is a citizen of the State of Hawai`i.

## II. Background Facts

4. The Property at issue in this action is the real property located at 3880 Wyllie Road, Apartment 6A, Princeville HI 96722, TMK (4) 5-4-005-018 CPR 0020. [Exh. 24, Apartment Deed dated March 6, 2007 ("Exh. 24").]

5. D. Susott took title to the Property by deed executed March 6, 2007. [Id.] Galindo testified the purchase price was $490,000.

6. On April 8, 2010, D. Susott executed a quitclaim deed transferring title to the Property to Defendant ("Quitclaim Deed" and "the Transfer"). [Exh. C, California All-Purpose Acknowledgment dated April 8, 2010 ("Exh. C"); Exh. 30, Quitclaim Deed filed April 26, 2010 ("Exh. 30").]

7. J. Susott and D. Susott are brothers. [E. Auld-Susott Decl. at ¶¶ 1-2.]

8.  E. Auld-Susott is J. Susott's son.  D. Susott is E. Auld-Susott's uncle.  [Id.]

9.  Non-party Kathryn C. Susott ("K. Susott") is J. Susott and D. Susott's mother, and E. Auld-Susott's grandmother.  [Id.]

10.  K. Susott died in February 2009.  Her life insurance proceeds funded the Trusts.  [Id. at ¶¶ 11-13.]

11.  D. Susott is the income beneficiary of the Trusts and was the original trustee of the Trusts.  E. Auld-Susott and his sister are remainder beneficiaries of the Trusts, and E. Auld-Susott is the successor trustee of the Trusts.  [Id. at ¶¶ 15-16.]

12.  On October 26, 2009, D. Susott instructed that the Trusts' brokerage account issue payment totaling $350,000 to "Wells Fargo Home Mortgage," and these payments were applied to pay off the remaining balance of a mortgage loan which was secured by the Property.  [Exh. 23, Letter from Daniel C. Susott MD, MPH to Adrian Antonio dated October 26, 2009 ("Exh. 23"); E. Auld-Susott Decl. at ¶ 39 (identifying the payment as coming from the Trusts' accounts).]

13.  By November 2, 2009, D. Susott had removed nearly all of the Trusts' principal, which was about $1,000,000.  [E. Auld-Susott Decl. at ¶ 20.]

14.  On January 26, 2011, E. Auld-Susott filed In re: ILIT of Susott, Case No. MP 20193 ("MP20193"), in the Superior Court

of Monterey County, State of California ("California state court"), in which he demanded D. Susott provide a financial accounting for the Trusts.

15.  On December 9, 2011, J. Susott filed <u>Susott v. Susott</u>, Case No. M115348 ("M115348"), in the California state court, in which he alleged D. Susott committed elder abuse against their mother.  [Exh. EE, Complaint filed September 25, 2012, ("Exh. EE").]

16.  On November 13, 2012, in MP20193, the California state court issued an order: removing D. Susott as trustee of the Trusts; appointing E. Auld-Susott as successor trustee; surcharging D. Susott $1,500,917 for breach of trust and fiduciary duties; and authorizing E. Auld-Susott, as successor trustee, to take collection actions against D. Susott ("Surcharge Order").  [Exh. 29, Order After Hearing on Petition for Removing and Surcharging Trustee; Appointment of a Successor Trustee and for Attorneys Fees and Costs, filed with the Bureau of Conveyances on November 17, 2014 ("Exh. 29").]

17.  Pursuant to the Surcharge Order and since November 13, 2013, E. Auld-Susott has attempted to recover assets from D. Susott to satisfy the Surcharge Order.  E. Auld-Susott performed an accounting of the amount recovered and the amount still owed to the Trusts pursuant to the Surcharge Order.

[E. Auld-Susott Decl. at ¶¶ 28-29.]  As of June 26, 2018, the amount D. Susott owes the Trusts is $841,407.68.  [Id. at ¶ 30.]

18.   The Surcharge Order has not been fully satisfied. [Id.]

19.   On April 17, 2013, in M115348, the California state court issued J. Susott a judgment against D. Susott in the amount of $1,624,125.07.  On October 24, 2015, J. Susott filed a copy of the judgment issued in M115348 in Hawai`i state court pursuant to the Uniform Enforcement of Foreign Judgments Act, Haw. Rev. Stat. Chapter 636C ("J. Susott's Judgment").  [Exh. 35, Exemplified Foreign Judgment ("Exh. 36").]

20.   J. Susott has not received full payment from D. Susott for the amount owed on J. Susott's Judgment.  [J. Susott Decl. at ¶¶ 15-17; E. Auld-Susott Decl. at ¶¶ 28-34.]

21.   The Court finds that J. Susott's Judgment has not been fully satisfied.

## III. D. Susott's Actual Intent and the Badges of Fraud

22.   D. Susott did not testify at trial.

23.   The Court finds, by clear and convincing evidence, that D. Susott made the Transfer with actual intent to hinder, delay, or defraud Plaintiffs, in their capacity as creditors, to recover the Property to satisfy debts D. Susott owed to Plaintiffs.  This finding is based on considering the eleven badges of fraud and other evidence of D. Susott's actual intent.

9

**A.  Whether the Transfer Was to an Insider**

24.  Defendant refers to D. Susott as her "hanai brother" and D. Susott refers to her as his "hanai sister."  Defendant considers herself to be K. Susott's "hanai daughter."  [Galindo Decl. at ¶ 4.]

25.  "The Hawaiian word 'hanai' is translated as adopted or foster child, and is sometimes used to refer to an informal (rather than legally binding) adoptive relationship."  <u>Munquia v. Grelyn of Maui, LLC</u>, Civ. No. 09-00058 HG-BMK, 2011 WL 1364026, at *1 n.1 (D. Hawai`i Apr. 8, 2011) (citing <u>Hawaiian Dictionary: Revised and Enlarged Edition</u> 57 (Mary Kawena Pukui & Samuel H. Elbert eds., 1986)).

26.  Defendant became friends with D. Susott in 1983.  [Galindo Decl. at ¶ 3.]  Defendant and D. Susott have had a "close relationship" for "many years" and show "affection, concern, and caring for each other as close friends."  [<u>Id.</u> at ¶ 59.]

27.  Defendant and D. Susott have engaged in numerous, undocumented, highly informal, and high-value financial transactions.  These transactions include:

    a.  **D. Susott's 2007 purchase of the Property** – D. Susott took out a mortgage on the Property ("Mortgage"), and borrowed money from E. Auld-Susott to provide the down payment required to obtain the Mortgage.  [<u>Id.</u> at ¶ 28.]

    b.  **The Transfer** – Defendant and D. Susott agreed to a purchase price of $350,000 for the Property but,

due to the close nature of their friendship, no agreement was finalized as to how payment would be made. [<u>Id.</u> at ¶ 57.]

    c.    **Defendant's informal recording of alleged payments <u>she made in consideration for the Transfer</u>** – Defendant contends that she made numerous payments toward the purchase price for the Property without documentation or acknowledgment of these payments. [<u>Id.</u> at ¶ 46.]

    d.    <u>**Not documenting a loan of $188,000**</u> - Defendant contends she loaned D. Susott $188,000 for Bali, Indonesia investments in the early 2000s and this loan was not documented due to the mutual trust between them. [<u>Id.</u> at ¶ 68.]

    e.    <u>**Forgetting about a $60,000 documented loan**</u> – Defendant contends that she loaned D. Susott $60,000 for which D. Susott executed a loan agreement on June 5, 2001 and never repaid but Defendant never sought to collect repayment. [<u>Id.</u> at ¶ 76; Exh. 31 (loan agreement).]

28. At the time of the Transfer, Defendant and D. Susott were close friends and regarded each other as family.

29. The court finds by clear and convincing evidence that, at the time of the Transfer, Defendant was an insider with respect to D. Susott.

30. This factor weighs in favor of finding that D. Susott made the Transfer with actual fraudulent intent.

    B.    **Whether D. Susott Retained <u>Possession or Control of the Property</u>**

31. Both before and after the Transfer, Defendant resided at the Property. [Galindo Decl. at ¶ 26.]

32. Before and after the Transfer, D. Susott resided at the property located on Woodlawn Drive in Honolulu, Hawai`i ("Woodlawn Property"). [E. Auld-Susott Decl. at ¶ 32; Galindo Decl. at ¶ 34.]

33. D. Susott never resided at the Property. [Galindo Decl. at ¶ 34.]

34. Since purchasing the Property on March 6, 2007, D. Susott expected and received financial or other contribution from Defendant in exchange for her residing at the Property, and D. Susott alone held a mortgage loan for the Property. [Id. at ¶ 28; Exh. 28 at 1-2.]

35. The Court finds by clear and convincing evidence that that D. Susott possessed and controlled the Property after he purchased it on March 6, 2007. This factor weighs in favor of finding a fraudulent transfer, and is probative of whether D. Susott made the transfer of the property to Defendant with the actual intent of defrauding Plaintiffs and allowing Defendant to retain the benefit of the Property without paying reasonable consideration.

**C.  Whether the Transfer was Disclosed or Concealed**

36. On July 6, 2009, E. Auld-Susott emailed D. Susott to inquire about the Susott Family Limited Partnership ("SFLP") purchasing the Property from D. Susott. In reply, D. Susott

stated via email on July 9, 2009 that Defendant was trying to purchase the Property. [Exh. 40.]

37. On April 26, 2010, the Quitclaim Deed was recorded. [Exh. 30.] The transfer of title was publicly disclosed by this recording.

38. The Court finds by clear and convincing evidence that D. Susott informed Plaintiffs as of July 9, 2009 that Defendant was intending to purchase the Property. This factor weighs in against finding a fraudulent transfer.

### D. Whether D. Susott Was Sued or Threatened With Suit Before He Made the Transfer

### Claims related to M115348

39. J. Susott believed that, from 1995 until K. Susott's death in 2009, D. Susott committed wrongful acts against their mother, including physical abuse, taking things of value, and inappropriately influencing her to provide him gifts. [J. Susott Decl. at ¶¶ 9-10.]

40. J. Susott told D. Susott on numerous occasions that he was potentially going to be sued for his actions against their mother. [Id. at ¶ 13.]

41. On October 18, 2009, J. Susott emailed E. Auld-Susott a letter that J. Susott was considering sending to D. Susott ("10/18/09 Email"). [Exh. 2.] The 10/18/09 Email discussed allegations that D. Susott financially abused their mother, stole a three-carat diamond ring by removing it their mother's finger,

13

judged D. Susott's character and recent conduct, and threatened to sue D. Susott.

42. J. Susott testified that he sent the 10/18/09 Email to D. Susott, and discussed its contents with D. Susott.

43. A preponderance of the evidence establishes that, at the time of the Transfer, D. Susott was aware from discussions with J. Susott and the 10/18/09 Email that serious allegations had been made against him and that legal action against him was threatened to be filed related to his alleged abuse of K. Susott.

## Claims related to MP20193

44. D. Susott admitted in his Supplemental Declaration dated June 12, 2013 and filed in MP20193 ("D. Susott Declaration") that he "recognized for a substantial period of time that [he] should not have withdrawn money from the trusts that are the subject of [the MP20193] action." [Exh. 14 at ¶ 15.]

45. Also acknowledged in the D. Susott Declaration is "the fact that [he] had been prevented from seeing [his mother] or getting her the care she needed because of false charges that [he] had sexually abused her . . . ." [Id. at ¶ 10.]

46. The Court finds that by clear and convincing evidence that, at the time of the Transfer, D. Susott was aware of potential claims against him which could result in legal judgments for which he would be required to pay.

**E.  Relationship Between D. Susott's Awareness of
      Claims and D. Susott's Actual Fraudulent Intent**

47.  At the time of the Transfer, a preponderance of the
evidence establishes that D. Susott was aware of potential claims
against him for alleged abuse of his mother and for breach of
fiduciary duty as a trustee.  The magnitude of these potential
claims is illustrated by the amount of D. Susott's withdrawals
from the Trusts (approximately $1,000,000), and the amounts
awarded in J. Susott's Judgment ($1,624,125.07) and in the
Surcharge Order ($1,500,917.00).  D. Susott's awareness that
these claims could be brought against him makes it likely that he
made the Transfer with actual fraudulent intent.

**F.  Whether the Transfer Was of
      Substantially All of D. Susott's Assets**

48.  At the time of the Transfer, D. Susott's assets was
largely comprised of his equity in the Property and the Woodlawn
Residence, and his interest in the SFLP.  [E. Auld-Susott Decl.
at ¶¶ 20, 35; Exh. 14 at ¶¶ 2, 14; Exh. 16, Examination of
Judgment Debtor taken on March 1, 2016 ("Exh. 16"), at 30.]

49.  No person with direct knowledge testified or expert
witness as to D. Susott's total assets at the time of the
Transfer.

50.  D. Susott "disbursed most of the [Trust's] funds [he]
withdrew within a few months in 2009."  [Exh. 14 at ¶ 13.]

51.  In the two years following the Transfer, D. Susott appears to have little or no liquid assets.  D. Sussott Declaration states that his "[n]et income for 2011 was <u>negative</u> $ $30,594 (sic) and for 2012, it was less $1.183 (sic)."  [<u>Id.</u> at ¶ 2.]

52.  Under the facts of this case, consideration of D. Susott's equity in the Property and the Woodlawn Residence in comparison to his cash resources is appropriate.  D. Susott converted $350,000 cash to equity in the Property when, on October 26, 2009, he directed the Trust's funds to be used to pay Wells Fargo Home Mortgage in the amount of $200,000 for the mortgage loan secured by the Woodlawn Property, and the amount of $150,000 for the mortgage loan secured by the Property.  [Exh. 23 at 1.]

53.  Before or around the time of the Transfer, the Woodlawn Residence was encumbered by a mortgage loan.  D. Susott converted $250,000 cash to equity in the Woodlawn Residence when he directed the Trust's funds to be used to pay off "a $250,000 mortgage loan on [his] home in Hawaii . . . ."  [<u>Id.</u>]

54.  The Court finds by clear and convincing evidence that, at time of the Transfer, the Property was one of two significant assets with value which could be seized to satisfy legal claims against D. Susott.

55.  This factor weighs in favor of finding actual fraudulent intent.

**G.  Whether D. Susott Had Absconded**

56.  No evidence shows D. Susott had absconded at any point.

57.  This factor weighs against finding actual fraudulent intent.

**H.  Whether the Debtor Had Removed or Concealed Assets**

58.  This factor is inapplicable.

**I.  Whether D. Susott Received Consideration of Reasonable Equivalent Value for the Property**

59.  Defendant testified that, in October 2009, she and D. Susott orally agreed to terms by which she would purchase the Property for $350,000 ("Oral Purchase Agreement"), and that D. Susott made the Transfer pursuant to the Oral Purchase Agreement.  The Court finds Defendant's testimony to be not credible.

60.  At trial, Defendant testified that the terms of the Oral Purchase Agreement were that she would pay total consideration of $350,000, and that this total consisted of:

-$38,000 in cash, which Defendant's friend found in Defendant's safe in October 2009, which was the exact amount D. Susott needed to payoff the Mortgage;

-$188,000 in debt forgiveness for unrecorded loans Defendant extended to D. Susott in the 2000 to 2002 time period for his investments in property in Bali, Indonesia;

-$17,530.37 credit for the mortgage interest tax credit that D. Susott allegedly took before the Transfer; and

-$140,000 to be paid in twenty-eight monthly increments of $5000 starting in October 2009.

61. Defendant testified that she actually provided consideration exceeding $383,000.

62. The first reference to the $188,000 purportedly related to loans extended by Defendant to S. Susott for purchases of property in Bali is contained in the quoted portion of an email Defendant sent to D. Susott on May 10, 2013 ("5/10/13 Email"), which is 13 to 11 years after these alleged loans are said to have been made. [Exh. E, Email to Lauryn Galindo from Lauryn Galindo dated May 10, 2013 ("Exh. E") at 1.] There is no contemporaneous documentation of the purported loans nor do any of Defendant's accounting documents reflect forgiveness of prior debts. [Exh. SS, Email to Lauryn Galindo from Lauryn Galindo dated December 5, 2010 ("Exh. SS"); Exh. YY, Email to Lauryn Galindo from Lauryn Galindo dated August 25, 2010 (Exh. YY").] This lengthy passage of time weighs against finding Defendant's testimony is credible.

63. D. Susott's receipt of a $17,530.37 home mortgage tax credit also first appears in the 5/10/13 Email. [Exh. E at 2 ("mortgage interest received from the borrower $17,530.37 this was your tax credit in 2008 on my mortgage payments").] Defendant's earlier accountings do not mention mortgage tax benefits. [Exhs. SS, YY.]

64.  No evidence was adduced that D. Susott was eligible for any mortgage interest tax credit nor that he actually received any credit or deduction because of any payments made by Defendant.

65.  No evidence was adduced that D. Susott agreed to accept forgiveness of antecedent debts as consideration for the Transfer.

66.  Defendant's failure to provide corroborating evidence such as records or testimony from her accountant, or to explain the lack thereof, weighs against finding Defendant's testimony credible as to the $34,000 and $38,000 payments.

67.  Defendant testified that she and D. Susott executed a written loan agreement to document a $60,000 loan in 2001 but did not likewise execute a written contract for the Transfer (which was a $350,000 transaction), and instead proceeded by oral agreement.  Defendant's testimony that she had a purchase agreement for the Property is not credible.

68.  While Defendant testified that she made various payments to D. Susott or on his behalf, no evidence was adduced that D. Susott accepted these alleged payments as consideration for the Transfer as opposed to accepting these payments as gifts or as rental payments for Defendant's use of the Property.

69.  While Defendant testified that she paid legal fees on behalf of D. Susott directly to his attorneys, no evidence was

presented (such as bank records or invoices) demonstrating that these payments were in fact made. Nor was evidence adduced (such as records from the attorneys) which confirm receipt of these alleged payments. Moreover, even if the alleged payments were made and received, there is no evidence that D. Susott acknowledged or agreed to receive the payments as consideration for the Transfer as opposed to accepting these payments as gifts or as rental payments for Defendant's use of the Property.

70. The Court finds by clear and convincing evidence that, to the extent Defendant transferred money to or for the benefit of D. Susott, no credible evidence exists to establish that these transactions were part of any consideration exchanged for the Transfer.

71. The Court finds by clear and convincing evidence that Defendant did not provide reasonable consideration to D. Susott in exchange for the Transfer, *i.e.*, taking title by quitclaim deed to the Property. This factor weighs heavily in favor of actual fraudulent intent.

**J. Whether D. Susott Was Insolvent or Became Insolvent Shortly After the Transfer Was Made**

72. No evidence was adduced to establish D. Susott's total assets and liabilities before and after the Transfer.

73. In early 2013, which is after the Transfer, the Trusts seized D. Susott's interest in the SFLP, which the Trusts valued at $955,677.10, and D. Susott's Schwab account, which contained

$48,680.62. [E. Auld-Susott Decl. at ¶ 32; Exh. 39.] There is no evidence in the record to dispute that D. Susott also possessed these assets at the time of the Transfer.

74. The Trusts unsuccessfully attempted to seize an IRA account and a private equity holding known as PAX Technologies from D. Susott, and no other assets, aside from D. Susott's Residence and the Property, are available to satisfy the Surcharge Order. [E. Auld-Susott Decl. at ¶ 32.]

75. No direct evidence shows the value or equity of the Woodlawn Residence at the time of the Transfer. Currently, the Woodlawn Residence is encumbered by a federal tax lien of $239,608.23 and a Hawai`i state tax lien of $11,637.72 for tax years 2009 and 2010. [Id. at ¶ 116; Exh 16 at 22.] After the Transfer, the Woodlawn Residence was encumbered with a private second mortgage loan obtained on April 4, 2013 for $500,000, and at least $625,000 with accrued interest is currently outstanding on the Woodlawn Residence. [E. Auld-Susott Decl. at ¶ 115; Exh. 16 at 38-40.] Thus, around the time of the Transfer in 2010, D. Susott had substantial equity in the Woodlawn Residence.

76. J. Susott's Judgment of $1,624,125.07 and the Surcharge Order of $1,500,917 are significant liabilities which existed against D. Susott at the time of the Transfer, and which were known to D. Susott at that time.

77. In the period of time contemporaneously with events leading up to and culminating in the Transfer, D. Susott told Defendant on June 27, 2009 and on August 7, 2010 in emails that he had no money and was "bottoming out financially", and asked Defendant "is there any way [she] can put ANYTHING in [his] account?" [Exh. 5, Email from Daniel Susott to Lauryn Galindo dated June 27, 2009 ("Exh. 5"); Exh. 7, Email from Daniel Susott to Lauryn Galindo dated August 9, 2010 ("Exh. 7") (emphasis in original).]

78. The Court finds by clear and convincing evidence that D. Susott became insolvent shortly after the Transfer was made and did not have ready access to funds. This factor weighs in favor of finding D. Susott made the Transfer with actual fraudulent intent.

### K. Whether D. Susott Made the Transfer Shortly after Incurring a Substantial Debt

79. D. Susott withdrew almost all of the funds from the Trusts within months of becoming trustee in 2009. [E. Auld-Susott Decl. at ¶ 20; Exh. 14 at ¶ 13.]

80. D. Susott spent the funds obtained from the Trusts to pay "off a $350,000 mortgage loan on the [Property]" and to pay "off a $250,000 mortgage loan on [the Woodlawn Residence]", to donate over $100,000 to various charities, and to lend $30,000 to a friend to start a business. [Exh. 14 at ¶ 14.] This conduct

gave rise to the Trusts' claims in MP20193 and, ultimately, the California state court's issuance of the Surcharge Order.

81. In 2013, D. Susott stated that "recognized for a substantial period of time that [he] should not have withdrawn the money from the trusts . . . ." [Id. at ¶ 15.]

82. The Court finds by clear and convincing evidence that D. Susott made the Transfer within months of depleting the assets of the Trusts, which is the basis of the Trusts' claims in MP20193, and that he knew these withdrawals might result in legal claims against him. This factor weighs in favor of finding D. Susott made the Transfer with actual fraudulent intent.

**L. Whether D. Susott Had Transferred the Essential Assets of the Business to a Lienor Who Had Transferred the Assets to an Insider of D. Susott**

83. This factor is not applicable.

**M. Other Circumstances Pertinent to Actual Intent**

84. Defendant claims that, when D. Susott bought the Property in 2007, he bought it for her. Specifically, she claims that D. Susott was helping Defendant to finance the purchase of the Property. [Galindo Decl. at ¶¶ 25-28.]

85. After taking title to the Property in March 2007, D. Susott consistently regarded the Property as his, not Defendant's. In emails sent to E. Auld-Susott in March 2007, D. Susott regards the Property as an income investment, and Defendant's role as either a renter or as a person who would help

find renters. [Exhs. 3, 12.] In an email sent to E. Auld-Susott on September 28, 2008, D. Susott states he is planning to sell the Property because he fears Hawai`i property values will go down. [Exh. 38.] In the 5/10/13 Email to D. Susott, Defendant wrote that it was "unfortunate" that the Property was "bought at the height of the market causing a loss of $100,000 . . . hopefully you will recoup this loss many times over!!" [Exh. E at 1.]

86. In a July 6, 2009 email, D. Susott tells Defendant that he will "discuss with Evan" the possibility of "[S]FLP buying the [Property] and then renting it (to you for example)." [Exh. 26.] Ultimately, the SFLP purchase of the Property did not "go[] forward" because Defendant was "trying to buy" the Property. [Exh. 40.] D. Susott's repeated thoughts of selling the Property to other persons comprises evidence which refutes Defendant's claim that the plan for the Property was always to transfer title to her. Defendant's testimony to the contrary is not credible.

87. On January 6, 2009, D. Susott rebuffed Defendant's inquiry as to how she could "secure [her] interest in [the Property]?" because she had not paid him enough. [Exh. 28 at 1-2 ("I am not sure that you've even paid a fair rent since the beginning, let alone anything close to a partnership.").] D. Susott's change from being concerned about receiving sufficient consideration for the Property to being willing to

transfer title for no consideration within a matter of months strongly suggests D. Susott made the Transfer with actual fraudulent intent.

88.  Defendant presented evidence that her accountant prepared a table summarizing her payments of the Mortgage on the Property, which were $2,462.91 per month, for the period from March 2008 until February 2009.  [Exh. E at 4.]  Defendant lived at the Property during this time.  This table includes her utility payments for the same period which Defendant contends were part of the consideration she provided in exchange for the Transfer.  There is evidence that D. Susott questioned whether Defendant had "even paid a fair rent since the beginning." [Exh. 28 at 1-2.]  These payments include utilities which are more akin to rental payments than mortgage payments, and do not support a valid transfer of the Property.

89.  Considering all the pertinent circumstances, this Court finds, by clear and convincing evidence, that D. Susott made the transfer with the actual intent to hinder, delay, or defraud Plaintiffs in their efforts to pursue their claims related to D. Susott's alleged abuse of K. Susott and D. Susott's alleged breach of fiduciary duty against the Trusts.

**IV.  When Plaintiffs Discovered Their Claims**

90.  Based on the July 8, 2009 email stating Defendant was "trying to buy" the Property, [Exh. 40,] Plaintiffs did not have

reason to inquire whether D. Susott conveyed the Property to Defendant with actual fraudulent intent.

91. On March 1, 2016, Plaintiffs conducted their judgment debtor examination of D. Susott ("Judgment Debtor Examination").[4] During that examination, under oath, D. Susott stated that, for transferring the Property to Defendant, he had either received no consideration or had received one dollar ("3/1/16 Statement"). [Exh. 16 at 31 of 33.]

92. The 3/1/16 Statement provided Plaintiffs reason to inquire whether D. Susott made the Transfer with actual intent to defraud Plaintiffs.

93. From July 8, 2009 and up to March 1, 2016, no evidence shows Plaintiffs had such any such reason to inquire.

94. E. Auld-Susott initially retained the law firm of Carlsmith Ball in 2013 to execute his judgment against D. Susott, on November 24, 2015, he retained the Law Offices of Peter Knapman. [E. Auld-Susott Decl. at ¶ 33.]

95. The inability of E. Auld-Susott, who is not a lawyer, to explain why his lawyers did not conduct the Judgment Debtor Examination earlier is insufficient to establish Plaintiffs failed to exercise reasonable diligence in their collection efforts against D. Susott.

---

[4] The record does not indicate whether the Judgment Debtor Examination was conducted to recover moneys owed pursuant to MP20193, M115348, or both.

96.  No evidence shows Plaintiffs were aware of any information, prior to March 1, 2016, which would cause a reasonable person to inquire whether the Transfer was fraudulent.

97.  The Court finds that Plaintiffs acted with reasonable diligence in pursuing their fraudulent conveyance claim.

## V.  Defendant is Not a Good Faith Transferee

98.  D. Susott's sudden willingness to accept little or no consideration for the Property provided Defendant with notice of D. Susott's actual fraudulent purpose.  The Court therefore finds that Defendant should have known of D. Susott's actual fraudulent purpose.

99.  Defendant's testimony about unexpectedly finding $38,000 in the safe to give to D. Susott when he was $38,000 short in paying off the Mortgage in October 2009 is not credible. [Galindo Decl. at ¶ 46.]  There is also no corroborating evidence, such as documents or testimony as to any receipt of the purported $38,000 payment.

100. No evidence was presented as to the Mortgage balance nor to any Mortgage payoff as of October 2009.

101. In the absence of corroborating evidence such as contemporaneous receipts or other acknowledgment, Defendant's testimony that she had been giving D. Susott an annual gift of $12,000, that she had given him in $38,000 in cash in October

2009, that she had given him $34,000, and that these payments were consideration for the Transfer is not credible.

102. The Court finds by clear and convincing evidence that Defendant provided no value in exchange for the Transfer.

103. The Court finds by clear and convincing evidence that Defendant did not take the Property in good faith.

104. The Court finds by clear and convincing evidence that Defendant knew that the Transfer was done for the purpose of defrauding Plaintiffs who were likely to be D. Susott's creditors because of his impermissible withdrawal of almost all of the funds in the Trusts, and therefore the Transfer was not made in good faith.

105. The Court finds by clear and convincing evidence that D. Susott's intent in transferring the Property to Defendant was for the purpose of defrauding Plaintiffs who were likely to be D. Susott's creditors because of his impermissible withdrawal of almost all of the funds in the Trusts.

**CONCLUSIONS OF LAW**

**A.** **Jurisdiction and Venue**

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 and venue pursuant to 28 U.S.C. § 1391(b).

**B.** **Statute of Limitations**

2. Under Haw. Rev. Stat. § 651C-9(1), a cause of action for fraudulent transfer brought under Haw. Rev. Stat. § 651C-

4(a)(1) "is extinguished . . . within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant."

3.   Under § 651C-9(1), the "one-year period begins 'when a plaintiff discovers the fraudulent nature of a potential transfer,' rather than simply the transfer itself." Schmidt v. HSC, Inc. ("Schmidt II"), 136 Hawai`i 158, 179, 358 P.3d 727, 748 (Ct. App. 2015) (quoting Schmidt v. HSC, Inc. ("Schmidt I"), 131 Hawai`i 497, 507, 510, 319 P.3d 416, 426, 429 (2014)).

4.   Whether Plaintiffs could reasonably have discovered the fraudulent nature of the Transfer before the Judgment Debtor Examination is a mixed question of law and fact that depends on all the circumstances. See id. at 180, 358 P.3d at 749.

5.   "Under Hawaii's discovery rule, the statute of limitations begins to run when the plaintiff discovers or should have discovered the [wrongful] act, the damage, and the causal connection between the former and the latter." Thomas v. Kidani, 126 Hawai`i 125, 132, 267 P.3d 1230, 1237 (2011) (citation and internal quotation marks omitted). "'When there has been a belated discovery of the cause of action, the issue whether the plaintiff exercised reasonable diligence is a question of fact for the court or jury to decide.'" Id. at 133, 267 P.3d at 1238

(quoting <u>Vidinha v. Miyaki</u>, 112 Hawai`i 336, 342, 145 P.3d 879,
885 (App. 2006)).

      6.    Under the discovery rule,

> reasonable diligence is not an absolute standard,
> but is what is expected from a party who has been
> given reason to inform himself of the fact upon
> which his right to recovery is premised. . . .
> [T]here are [very] few facts which diligence
> cannot discover, but there must be some reason to
> awaken inquiry and direct diligence in the channel
> in which it would be successful.

<u>Vidinha</u>, 112 Hawai`i at 341, 145 P.3d at 884 (citation and
internal quotation marks omitted) (some alterations in <u>Vidinha</u>),
*aff'd*, No. 26188, 2007 WL 1957196 (Hawai`i June 26, 2007).  In
other words, "the discovery rule does not place the burden on a
plaintiff to learn every discoverable fact; rather, the relevant
question is whether the plaintiff knew of facts that would cause
a reasonable individual to perform a further inquiry."  <u>Skyline
Zipline Glob., LLC v. Domeck</u>, Civil No. 12-00450 JMS-BMK, 2013 WL
1103084, at *7 (D. Hawai`i Mar. 15, 2013) (citing <u>Vidinha v.
Miyaki</u>, 112 Haw. 336, 341, 145 P.3d 879, 884 (Haw. App. 2006)).

      7.    "Reasonable diligence 'means simply that an injured
party must act with some promptness where the facts and
circumstances of an injury would put a person of common knowledge
and experience on notice that some right of his has been invaded
or that some claim against another party might exist.'"  <u>Id.</u> at
*8 (quoting <u>Ass'n of Apartment Owners of Newtown Meadows ex. rel.</u>

its Bd. of Dirs. v. Venture 15, Inc., 115 Haw. 232, 270, 167 P.3d 225, 277 (2007)).

8.   Because Plaintiffs commenced this action on August 10, 2016 - more than four years after D. Susott transferred the Property to Defendant - Plaintiffs' claim under § 651C-4(a)(1) is time-barred unless the discovery rule applies.  See § 651C-9(1).

9.   Plaintiffs' one-year period under § 651C-9(1) began on March 1, 2016, when Plaintiffs "discover[ed] the fraudulent nature of" the Transfer during the Judgment Debtor Examination. See Schmidt II, 136 Hawai`i at 179, 358 P.3d at 748 (internal citation and quotation marks omitted).  In other words, during the Judgment Debtor Examination, Plaintiffs learned "of facts that would cause a reasonable individual to perform a further inquiry" as to whether the Transfer was fraudulent.  See Skyline Zipline, 2013 WL 1103084, at *7.

10.  Even assuming Plaintiffs could have scheduled the Judgment Debtor Examination years before March 1, 2016, this does not affect whether they pursued their fraudulent transfer claim with reasonable diligence.  The purpose of the Judgment Debtor Examination was to recover assets to satisfy D. Susott's debts; it was not to question D. Susott about a suspected fraudulent transfer.  Even if the fraudulent nature of the Transfer was a fact which Plaintiffs, through diligence hypothetically could have discovered if they had inquired earlier, before the 3/1/16

Statement there was no "reason to awaken inquiry and direct diligence" towards that inquiry. <u>See</u> <u>Vidinha</u>, 112 Hawai`i at 341, 145 P.3d at 884 (citation and internal quotation marks omitted).

11.  Plaintiffs exercised reasonable diligence in pursuit of their Count I claim.

12.  Even assuming Plaintiffs were required to show they diligently pursued execution of their judgments against D. Susott, their retention of the Carlsmith Ball law firm in 2013 and of the Law Offices of Peter Knapman in 2015 suffices to show Plaintiffs exercised reasonable diligence.

13.  Plaintiffs' Count I claim is timely under § 651C-9(1).

**C.  Plaintiffs' Prima Facie Showing
for Liability Under § 651C-4(a)(1)**

14.  To establish liability on their Count I claim, Plaintiffs must show that D. Susott made the Transfer "[w]ith actual intent to hinder, delay, or defraud any creditor of [his]." <u>See</u> § 651C-4(a)(1).

15.  Haw. Rev. Stat. § 651C-1 states:

>       "Claim" means a right to payment, whether or
> not the right is reduced to judgment, liquidated,
> unliquidated, fixed, contingent, matured,
> unmatured, disputed, undisputed, legal, equitable,
> secured, or unsecured.

>       "Creditor" means a person who has a claim against
> a debtor.

>       "Debt" means liability on a claim.

32

"Debtor" means a person against whom a creditor has a claim.

16. To establish liability under § 651C-4(a)(1), a plaintiff must meet "the 'clear and convincing' standard of proof." <u>Kekona v. Abastillas</u>, 113 Hawai`i 174, 181, 150 P.3d 823, 830 (2006). Clear and convincing proof is "the degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established." <u>Id.</u> (internal quotation marks omitted).

17. Liability under § 651C-4(a)(1) depends only on the debtor-transferor's intent. <u>Schmidt II</u>, 136 Hawai`i at 170-71, 358 P.3d at 739-40. "The transferees' fraudulent intent, lack thereof, or even good faith acceptance of the transferred asset, is not at issue." <u>Id.</u> at 171, 358 P.3d at 740. "In other words, first, the fact-finder must determine whether there is clear and convincing evidence of the transferor's fraudulent intent. Then, the fact-finder may examine [the transferee's affirmative defense of taking] in good faith **and** for reasonably equivalent value." <u>Id.</u> at 167, 358 P.3d at 736 (emphasis in original).

18. The Hawai`i Intermediate Court of Appeals has stated:

> The purpose of the [Uniform Fraudulent Transfer Act ("UFTA")] is to stop a debtor from deliberately cheating a creditor by placing property beyond his or her reach. As direct evidence of "actual intent to hinder, delay, or defraud" is rare, particularly when the intent to be proven is that of a corporate transferor, UFTA includes a non-exclusive list of factors,

33

sometimes referred to as badges of fraud, to aid
the fact-finder.

Schmidt II, 136 Hawai`i at 165, 358 P.3d at 734 (internal

citations omitted).  Haw. Rev. Stat. § 651C-4(b) provides:

> In determining actual intent under
> [§ 651C-4(a)(1)], consideration may be given,
> among other factors, to whether:
>
> (1)  The transfer or obligation was to an insider;
>
> (2)  The debtor had retained possession or control of
> the property transferred after the transfer;
>
> (3)  The transfer or obligation was disclosed or
> concealed;
>
> (4)  Before the transfer was made or obligation was
> incurred, the debtor was sued or threatened with suit;
>
> (5)  The transfer was of substantially all the
> debtor's assets;
>
> (6)  The debtor had absconded;
>
> (7)  The debtor had removed or concealed assets;
>
> (8)  The value of the consideration received by
> the debtor was reasonably equivalent to the value
> of the asset transferred or the amount of the
> obligation incurred;
>
> (9)  The debtor was insolvent or became insolvent
> shortly after the transfer was made or the
> obligation was incurred;
>
> (10) The transfer had occurred shortly before or
> shortly after a substantial debt was incurred; and
>
> (11) The debtor had transferred the essential
> assets of the business to a lienor who had
> transferred the assets to an insider of the
> debtor.

19.  The badges of fraud guide the trial court in evaluating whether clear and convincing evidence shows transferor's fraudulent intent.  <u>Schmidt II</u>, 136 Hawai`i at 179, 358 P.3d at 748.  In making this determination, the trial court must also consider any other relevant indicia of the transferor's actual intent.  <u>Id.</u>  Thus, guided by the fifth badge of fraud, this Court considers both whether the Transfer was of substantially all of the D. Susott's assets and whether the Transfer was of substantially all of D. Susott's liquid assets.  <u>See</u>, *supra*, Findings of Fact ¶¶ 48-55.

20.  In evaluating the transferor's actual intent, the trial court must consider together, as a whole, the evidence regarding the badges of fraud and other indicia of actual intent.  Depending on the unique circumstances of each case, each of the badges of fraud "may either support, negate, or, in some instances, not have an effect on the determination of an UFTA debtor's actual intent to hinder, delay, or defraud an UFTA creditor."  <u>Schmidt II</u>, 136 Hawai`i at 175, 358 P.3d at 744 (quoting Uniform Fraudulent Transfer Act 7A Part II (U.L.A.) § 4, cmt. 5, p. 60 (2006)).

**D.  <u>Defendant's Insider Status</u>**

21.  The fact that an allegedly fraudulent transfer was made to an insider is not, by itself, "sufficient to warrant avoidance

when unaccompanied by any other evidence of fraud." <u>Schmidt II</u>,

136 Hawai`i at 176, 358 P.3d at 745.

22.  Haw. Rev. Stat. § 651C-1 states an "[i]nsider includes

. . . [a] relative of the debtor."  Hawai`i law neither

exhaustively defines insider status nor sets forth a standard for

evaluating whether a friend of the debtor is an insider.[5]

23.  Useful guidance is provided by decisions evaluating

insider status under the California Uniform Voidable Transactions

Act ("CUVTA").[6]  "'[A] special relationship between the debtor

_____

[5] This Court has recognized that:

> When interpreting state law, a federal court is
> bound by the decisions of a state's highest court.
> <u>Trishan Air, Inc. v. Fed. Ins. Co.</u>, 635 F.3d 422,
> 427 (9th Cir. 2011).  In the absence of a
> governing state decision, a federal court attempts
> to predict how the highest state court would
> decide the issue, using intermediate appellate
> court decisions, decisions from other
> jurisdictions, statutes, treatises, and
> restatements as guidance.  <u>Id.</u>; <u>see also</u>
> <u>Burlington Ins. Co. v. Oceanic Design & Constr.,</u>
> <u>Inc.</u>, 383 F.3d 940, 944 (9th Cir. 2004) ("To the
> extent this case raises issues of first
> impression, our court, sitting in diversity, must
> use its best judgment to predict how the Hawai`i
> Supreme Court would decide the issue." (quotation
> and brackets omitted)).

<u>DeRosa v. Ass'n of Apartment Owners of the Golf Villas</u>, 185 F.
Supp. 3d 1247, 1251 (D. Hawai`i 2016) (some citations and
internal quotations marks omitted).

[6] Both CUVTA and HUFTA list eleven materially similar badges
of fraud, including whether the transferee is an insider.
<u>Compare</u> Cal. Civ. Code § 3439.04 <u>with</u> Haw. Rev. Stat. § 651C-4.
Chapter 651C implements "Hawaii's version of the Uniform
(continued...)

36

and the transferee' is one of the 'more common circumstantial indicia of fraudulent intent'" by the debtor.  <u>Kaisha v. Dodson</u>, 423 B.R. 888, 901 (N.D. Cal. 2010) (quoting <u>In re Acequia, Inc.</u>, 34 F.3d 800, 806 (9th Cir. 1994)) (evaluating insider status as badge of fraud under CUVTA).  A transferee's insider status is supported where the debtor considers the transferee to be "a 'close friend' . . . whom [the debtor] regarded 'like [] family.'"  <u>In re Tenorio</u>, BAP No. CC-17-1102-FLKu, 2018 WL 989691, at *11 (B.A.P. 9th Cir. Feb. 8, 2018) (citing <u>Kaisha v. Dodson</u>, 423 B.R. 888, 901 (N.D. Cal. 2010)) (evaluating insider status under CUVTA).

24.  Defendant is an insider for purposes of HUFTA.  The facts show Defendant and D. Susott were close friends and regarded each other like family.  Their close relationship is the sort "warrant[ing] close scrutiny of the other circumstances [of the Transfer], including the nature and extent of the consideration exchanged."  <u>See Schmidt II</u>, 136 Hawai`i at 176, 358 P.3d at 745 (emphasis omitted) (quoting Uniform Fraudulent Transfer Act 7A Part II (U.L.A.) § 4, cmt. 5, p. 60 (2006)).

---

[6](...continued)
Fraudulent Transfer Act."  <u>Sherry v. Ross</u>, 846 F. Supp. 1424, 1428 (D. Hawai`i 1994).  Hawai`i courts recognize decisions from "other UFTA jurisdictions" as persuasive authority when interpreting HUFTA.  <u>See, e.g.</u>, <u>Schmidt II</u>, 136 Hawai`i at 171, 358 P.3d at 740 (citations omitted) (citing Ohio and California law).

## E.    Plaintiffs Established Their
Prima Facie Case Under § 651C-4(a)(1)

25.    "[E]vidence pertaining to reasonably equivalent value
is germane to a finding of actual intent.  A determination that
[a debtor] did not receive reasonably equivalent value is
probative, circumstantial evidence tending to prove that [the
debtor] actually intended to defraud its creditors."  In re
Agric. Research & Tech. Grp., Inc. ("Agretech"), 916 F.2d 528,
537 (9th Cir. 1990).

26.    Plaintiffs have shown by clear and convincing evidence
that D. Susott made the Transfer "[w]ith actual intent to hinder,
delay, or defraud" Plaintiffs in their capacity as creditors of
D. Susott.  See § 651C-4(a)(1).  This conclusion is based on the
all evidence pertinent to D. Susott's actual intent, considered
as a whole.  See Schmidt II, 136 Hawai`i at 175, 358 P.3d at 744.

27.    Under the facts of this case, some evidence and some of
the badges of fraud were especially important, and some were less
important.  See id.  The "determination that [D. Susott] did not
receive reasonably equivalent value" for making the Transfer was
especially important to this Court's conclusion that he made the
Transfer with actual fraudulent intent.  See Agretech, 916 F.2d
at 537.

## F.   Defenses to Liability

28.   "A transfer or obligation is not voidable under section 651C-4(a)(1) against a person who took in good faith and for a reasonably equivalent value."  Haw. Rev. Stat. § 651C-8(a).

29.   "The transferee asserting [the good faith] defense has the burden of proving that he or she took in good faith and for a reasonably equivalent value."  Shigezo Haw., Inc. v. Soy to the World Inc., CAAP-14-0000920, 2016 WL 4542016, at *3 (Hawai`i Ct. App. Aug. 31, 2016) (some citations omitted) (citing In re Agricultural Research and Technology Group, Inc., 916 F.2d 528, 535-36, 539 (9th Cir. 1990) (construing HRS § 651C-8 as imposing the burden of proof on the transferee of showing good faith)).

30.   Because Defendant has not proven that she took the Property in good faith and provided D. Susott with a reasonably equivalent value, she fails to establish the affirmative defense applicable to good faith transferees under § 651C-8(a).

31.   Because Plaintiffs have established their prima facia case and Defendant has failed to establish any affirmative defense to liability, Defendant is liable to Plaintiffs on their Count I claim.

## G.   Directed Verdict

32.   Fed. R. Civ. P. 52(c) provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense

39

> that, under the controlling law, can be maintained
> or defeated only with a favorable finding on that
> issue. The court may, however, decline to render
> any judgment until the close of the evidence. A
> judgment on partial findings must be supported by
> findings of fact and conclusions of law as
> required by Rule 52(a).

33. A Rule 52(c) motion in a bench trial differs from a Fed. R. Civ. P. 50(a) motion in a jury trial because "Rule 52(c) expressly authorizes the district judge to resolve disputed issues of fact." Ritchie v. United States, 451 F.3d 1019, 1023 (9th Cir. 2006). "In deciding whether to enter judgment on partial findings under Rule 52(c), the district court is not required to draw any inferences in favor of the non-moving party; rather, the district court may make findings in accordance with its own view of the evidence." Id.

34. Because Plaintiffs have established their prima facie case under § 651C-4(a)(1) and Defendant fails to establish any affirmative defense, Defendant is not entitled to a directed verdict and her Rule 52(c) Motion is denied.

## H. Remedies

35. A creditor who establishes that a transfer is fraudulent is entitled, "subject to the limitations provided in section 651C-8," to obtain "[a]voidance of the transfer . . . to the extent necessary to satisfy the creditor's claim." Haw. Rev. Stat. § 651C-7(a)(1).

36.  "[I]f the transferee received the transfer in good faith, it may recover any value given in exchange for the transfer under Haw. Rev. Stat. § 651C-8(a)." <u>Agretech</u>, 916 F.2d at 539.

37.  In determining a transferee's good faith, "courts look to what the transferee objectively 'knew or should have known' . . . , rather than examining what the transferee actually knew from a subjective standpoint." <u>Id.</u> at 535-36.

38.  Where the transferee receives value grossly in excess of the value exchanged, this fact is "highly probative" of the debtor-transferor's bad faith. <u>Id.</u> at 539.  D. Susott's "willingness to accept virtually no value in exchange for its transfer of significant [value] should have put [Defendant] on notice of a fraudulent scheme." <u>See id.</u>  Accordingly, the Court concludes Defendant took the Property in objective bad faith.

39.  Because Defendant did not take the Property in objective good faith, she is not entitled to recover any value under § 651C-8(a).

40.  Plaintiffs are entitled to "[a]voidance of the [T]ransfer to the extent necessary to satisfy" their claims.  <u>See</u> § 651C-7(a)(1).

I.  **Unjust Enrichment and Constructive Trust**

41.  Under Hawai`i law,

> equity will not take jurisdiction when the
> complainant has a complete and adequate remedy at

41

> law. That rule does not apply, however, and this
> is one of the exceptions, when the claim of the
> complainant is of an equitable nature and admits
> of a remedy in a court of equity only.

Beneficial Haw., Inc. v. Kida, 96 Hawai`i 289, 312, 30 P.3d 895,

918 (2001) (citation and internal quotation marks omitted).

42. An unjust enrichment claim is an equitable claim.

Porter v. Hu, 116 Hawai`i 42, 66, 169 P.3d 994, 1007 (Ct. App.

2007).

43. "The constructive trust [is] a 'creature of equity.'"

Peine v. Murphy, 46 Haw. 233, 242, 377 P.2d 708, 713 (1962).

44. Because Plaintiffs have an adequate remedy at law under

the HUFTA for the Transfer, this Court lacks jurisdiction to

provide Plaintiffs equitable remedies for the Transfer. See

Beneficial Haw., 96 Hawai`i at 312, 30 P.3d at 918.

45. Plaintiffs' Count II and Count III claims are

dismissed.[7] See Sparling v. Hoffman Constr. Co., 864 F.2d 635,

638 (9th Cir. 1988) (trial court may sua sponte dismiss for

failure to state a claim without notice or an opportunity to

respond where "the plaintiffs cannot possibly win relief"

(alteration, citation and internal quotation marks omitted)).

---

[7] Defendant's Rule 52(c) Motion did not seek dismissal of
Plaintiffs' Count II and Count III claims on this basis.

## ORDER REGARDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

AND NOW, following the conclusion of a bench trial in this matter, and in accordance with the foregoing Findings of Fact and Conclusions of Law, it is HEREBY ORDERED that:

1.    The Court HEREBY DECLARES that the Transfer was fraudulent under § 651C-4(a)(1).

2.    Plaintiffs are entitled to avoidance of the Transfer to the extent necessary to satisfy their claims.

3.    The Court HEREBY DECLARES VOID the Quitclaim Deed, [Exh. 30,] executed on April 8, 2010 and recorded in the State of Hawai`i Bureau of Conveyances on April 26, 2010 as Document Number 2010-056095.

4.    The Transfer effected by the Quitclaim Deed is void. Title in the Property reverts from Defendant to D. Susott.

Pursuant to Federal Rule of Civil Procedure 54, judgment shall enter in favor of Plaintiffs on their fraudulent transfer claim.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, February 28, 2019



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**EVAN AULD-SUSOTT, ETC., ET AL. VS. LAURYN GALINDO**; CV 16-00450
LEK-RLP; FINDINGS OF FACT AND CONCLUSIONS OF LAW